J-S78012-17 & J-S78013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.W., AND K.W. MINORS, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.G., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | No. 602 WDA 2017 |

Appeal from the Order Entered March 21, 2017
In the Court of Common Pleas of Erie County Civil Division at No(s):  CP-25-DP-0000103-2016,
CP-25-DP-0000124-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: M.W., JR. & K.W., MINORS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  M.W., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | No. 694 WDA 2017 |

Appeal from the Order March 21, 2017
In the Court of Common Pleas of Erie County Domestic Relations at
No(s):  Nos 103 & 124 of 2016

BEFORE:   OLSON, J., DUBOW, J., and STRASSBURGER*, J.

MEMORANDUM BY OLSON, J.:                    **FILED FEBRUARY 13, 2018**

Appellants, S.G ("Mother") and M.W. ("Father") appeal from the orders dated March 15, 2017, and entered on March 21, 2017, that changed the permanency goals from unification with parents to adoption for their two children, M.W., Jr., a male born in April of 2016, and K.W., a female born in April of 2015, (collectively, "the Children").  We affirm.

_____
*   Retired Senior Judge assigned to the Superior Court.

The trial court set forth the factual background and procedural history of this appeal, with regard to Mother, as follows.

M.W., Jr. was born [in April of 2016] and adjudicated dependent on July 12, 2016. Mother was not present at the adjudication hearing and specific findings were made on the record supporting [Erie County Office of Children and Youth's (the Agency)] allegations [that Mother] was unable to meet M.W., Jr.'s basic needs. Permanency Hearing Transcript, 11/3/16, p. 3. The Agency was primarily concerned with M.W., Jr.'s continued weight loss in [Mother's] care. M.W., Jr. was seen at Children's Hospital of Pittsburgh, UPMC Hamot, and St. Vincent Hospitals. Providers at each facility observed [Mother] struggle to feed M.W., Jr., saw she was often asleep at feeding time, and that she did not respond to instruction given by hospital staff. As a result, M.W., Jr. was diagnosed with [n]on-[o]rganic [f]ailure to thrive. Doctors specifically stated [Mother's] lack of care caused M.W., Jr[.]'s severe weight loss, as he began to gain weight while he was in the hospital receiving regular care. Court Summary, March 15, 2017, p. 1-2. **See also** Permanency Hearing Transcript I, 3/15/17, p. 11.

K.W. was born [in April of 2015] and adjudicated dependent on August 26, 2016. The evidence presented at the adjudication hearing revealed [Mother] was not providing K.W. with a safe and stable home environment or providing for her basic needs. When Agency workers arrived at [Mother's] home, they noticed K.W. was screaming and suggested Mother give her something to drink. Mother refused, stating K.W. broke her "sippy cup a few days ago" and was not allowed to drink. When workers approached K.W. to comfort her, they found her in a crib, surrounded by a large teddy bear and multiple blankets caked in what appeared to be vomit or feces. Court Summary, March 15, 2017, p. 2. **See also** Permanency Hearing Transcript I, 3/15/17, p. 12, 57.

At the time K.W. was detained, the Agency also voiced concerns with [Mother's] poor home conditions, despite ongoing involvement with Agency services beginning in May, 2015. Permanency Hearing Transcript II, 3/15/17, p. 3. Workers found animal urine and feces on the floor of the residence, which K.W. was permitted to walk through. Again, workers noted dried, old, feces and vomit in K.W.'s bedding. Garbage, medications, and rotten food were strewn throughout the house. The Agency also

noted [Mother] acquiesced to Megan's Law offenders providing care for K.W. on several occasions. Court Summary, March 15, 2017, p. 2. *See also* Permanency Hearing Transcript I, 3/15/17, p. 12*.*

The first permanency review hearing was held on November 3, 2016. At this time, the [C]hildren had been in Agency care for approximately three months. The Agency recommended the goal be changed to adoption. The Agency stated Mother was resistant to services offered. Further, her unwillingness to cooperate made it difficult for the Agency to address its concerns with her. Permanency Hearing Transcript, 11/3/16, p. 3-4. [Mother] also failed to attend any visitation with the [C]hildren from the time the [C]hildren were adjudicated dependent to the November 3, 2016 hearing. Permanency Hearing Transcript I, 3/15/17, p. 15*.* The guardian *ad litem* for the [C]hildren agreed [Mother] was resistant to services, but felt it was too early to change the goal to adoption. [Mother] stated she wanted to "push[ ] forward with what [she'd] been trying to do" and that she could "put more effort, 100 percent more effort into it to do what [she] had to do." Permanency Hearing Transcript, 11/3/16, p. 3-4, 6*.*

The Juvenile Court found [Mother's] compliance and participation with services was abysmal and advised [Mother] she needed to do better if she wanted to be reunited with her children. Permanency Hearing Transcript, 11/3/16, p. 6*.*

Despite [Mother's] non-compliance, the Juvenile Court declined to change the goal to adoption and instead added adoption as a goal concurrent to reunification. A review was scheduled for 120 days. [Mother] was advised if she did not comply with services, the goal would be changed to adoption at the next hearing. [Mother] was also reminded she needed to continue contacting the Agency 24 hours prior to any visitation to confirm attendance because she missed so many visits with the [C]hildren in the past. If [Mother] wished to resume services with Erie Homes for Children and Adults, [Mother] was instructed she needed to make arrangements with that agency due to consistent non-compliance and resistance to their assistance. Finally, [Mother] was directed to participate in a psychiatric evaluation with Dr. [Peter] von Korff and sign all medical releases required for the doctor to complete a thorough report. Permanency Hearing Transcript, 11/3/16, p. 7-8, 10-13.

The next permanency review hearing was held on March 15, 2017. The evidence presented at this hearing revealed [Mother], once again, could not show she was able to provide a safe and stable environment for the [C]hildren, attend regular visits, or otherwise comply with treatment recommendations. Testimony[sic] the oldest child was diagnosed with Reactive Attachment Disorder and the results of [Mother's] evaluation with Doctor von Korff also supported the Agency's request the goal be changed to adoption and services to [Mother] be terminated.

Agency witnesses testified to [Mother's] inability to obtain or maintain safe and stable housing. In November, 2016, [Mother] was evicted from her apartment after she allowed other people to live in the home in violation of her lease. Some of these individuals were Megan's Law offenders who were permitted access to the [C]hildren. She also refused to allow maintenance into the apartment to repair plumbing which was leaking raw sewage openly through the basement. Conditions in the apartment were so hazardous Code Enforcement would not allow anyone else to live there. Despite eviction in November, 2016, [Mother] refused to vacate the residence and lived in these conditions until she was locked out in February, 2017. Permanency Hearing Transcript I, 3/15/17, p. 6, 23.

[Mother] obtained new housing approximately two weeks before the March, 2017 review hearing. However, an assessment of its cleanliness or suitability for children could not be completed because [Mother] was in the process of moving and much of [Mother's] belongings remained packed in boxes. Permanency Hearing Transcript I, 3/15/17, p. 16-17.

Despite [Mother's] request to reopen services with Project First Step at the end of November, 2016, Agency witnesses agreed [Mother] continued to be resistant to services and refused to "prioritize her children." In spite of an extensive conversation with Project First Step workers outlining program and court expectations, and the effect of missing visits on her standing with the court, [Mother's] attendance at visits was sporadic. [Mother] attended only 9 out of 18 visits between November, 2016 and March, 2017. Of those visits [Mother] attended, she was late four times. The amount of time [Mother] was late varied, and ranged from as few as ten minutes to as many as forty minutes per hour long visit. She never asked for increased visitation or extra time if she was late, and attempted to pass blame for her tardiness or

failure to appear onto others or illness. Permanency Hearing Transcript, I, 3/15/17, p. 5, 10, 15, 18, 43. **See also** Permanency Hearing Transcript, II, 3/15/17, p. 4-5.

Workers also noted that during the seven months the case was open, the only times [Mother] saw [the C]hildren were on these nine occasions. Permanency Hearing Transcript, I, 3/15/17, p. 42.

Finally, workers voiced concern about the results of Dr. von Korff's evaluation and [Mother's] inability to appreciate the [C]hildren's special and developmental needs. Despite thorough explanation of age appropriate goals and K.W.'s diagnosis of Reactive Attachment Disorder, [Mother did] not consistently show an ability to retain this information and apply it during visitation with the [C]hildren. [Although Mother] engaged the [C]hildren during visits and attempted to be the [C]hildren's main caretaker, the [C]hildren, especially K.W., did not show strong evidence of a bond with [Mother]. In fact, K.W. interacted with workers in much the same way she interacted with [Mother]. Permanency Hearing Transcript I, 3/15/17, p. 13-14, 27, 31.

It was clear to service providers [Mother] struggled with her own untreated mental health conditions, which hindered her ability to comply with the treatment plan and handicapped providers' ability to ensure services were specifically tailored to her needs. [Mother's] self-assessment to providers at Stairways Behavioral Health yielded no recommendation of services because [Mother] did not accurately represent her own mental health history or history of trauma. In fact, when workers suggested [Mother] seek mental health treatment, she became irate and extremely argumentative. Only after evaluation by Dr. von Korff did the scope and severity of [Mother's] mental health emerge. Permanency Hearing Transcript I, 3/15/17, p. 29, 33, 44. **See also** Permanency Hearing Transcript, II, 3/15/17, p. 7 and Psychological Evaluation, Dr. Peter von Korff, generally.

Dr. von Korff's evaluation, which was admitted into evidence without objection at the March 15, 2017 review hearing, offered no indication [Mother] functioned as a secure, primary attachment figure for the [C]hildren. Additionally, the report cited a very "guarded" prognosis for [Mother], given Project First Step's long-term involvement and caseworker's efforts. [Mother] showed no sign of recognizing or accepting the reasons for which M.W.,

- 5 -

Jr. was detained. In the doctor's opinion, it was in the [C]hildren's best interests to pursue adoptive options. Psychological Evaluation, Dr. Peter von Korff, p. 19-20; *[s]ee also* Permanency Hearing Transcript, [sic] I, 3/15/17, p. 3.

[Mother's] testimony revealed she did not appreciate the ramifications of missing visitation with [the C]hildren. She admitted to missing approximately half of the scheduled visits with her children. Instead of accepting responsibility for her poor performance, [Mother] consistently attempted to shift blame onto others. She did not address the state of the home in which the [C]hildren were living, or acknowledge her part in each child's failure to thrive. Permanency Hearing Transcript, [sic] II, 3/15/17, p. 31-37.

At the conclusion of the March, 2017 review hearing, the Juvenile Court concluded the Agency met its burden in establishing the change of goal to adoption was supported by clear and convincing evidence, and was in the [C]hildren's best interests. An order was entered March 21, 2017.

Trial Court Opinion (Mother), 5/16/17, at 1-6 (emphasis in original) (footnote added).[1]

On April 19, 2017, Mother filed her notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On April 20, 2017, Father filed his notice of appeal and concise statement.

In her brief on appeal, Mother raises the following issue:

---

[1] The trial court's recitation of the factual background and procedural history, as well as the discussion of the issues on appeal, was nearly identical in its separate Pa.R.A.P. 1925(a) opinions with regard to Mother and Father.

Whether the juvenile court committed an abuse of discretion and/or error of law when it determined that the concurrent permanency goal of reunification/adoption was no longer feasible, dispensed with the current goal of reunification, and directed the agency to provide no further services to [Mother] or provide visitation with the minor children[?]

Mother's Brief, at 2.[2]

In his brief on appeal, Father raises the following issue:

Did the Juvenile Court abuse its considerable discretion or commit an error of law when it ruled that the concurrent goal of "Reunification/Adoption" should be changed only to "Adoption" whereby the parents would no longer be involved in attempts at reunification with their respective children?

Father's Brief, at 2.

This matter is controlled by the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.* The Pennsylvania Supreme Court set forth our standard of review in a dependency case as follows.

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.*, 608 Pa. 9, [27], 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

---

[2] Mother's concise statement did not include the allegation that the trial court abused its discretion or erred when it directed the Agency not to provide further services to Mother, and not to provide her with visitation with the Children. Thus, we find Mother waived these allegations. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in her brief on appeal).

***In Interest of: L.Z.***, ***A Minor Child***, 631 Pa. 343, 360, 111 A.3d 1164, 1174 (Pa. 2015).

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

***In re A.K.***, 936 A.2d 528, 533 (Pa. Super. 2007) (*citing* 42 Pa.C.S.A. § 6351(f)).

Regarding the disposition of a dependent child, subsections 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

With regard to Mother's contention that the trial court abused its discretion in changing the Children's permanency goal to adoption, the trial court stated as follows:

> [Mother] alleges the Juvenile Court committed abuse of discretion when it changed the goal of the proceedings from reunification concurrent with adoption to adoption. This allegation lacks merit.

The Juvenile Act generally requires the child protective agency to request a goal change when the child has been in placement fifteen out of twenty-two months. 42 Pa.C.S.A. 6351(b)(9). The Superior Court has held the underlying policy of the Juvenile Act is to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to indefinite foster care or returning them to abuse homes. *In Re: C.B.*, 861 A.2d. 287, 295 (Pa. Super. 2004). Moreover, safety, permanency, and the well-being of the child must take precedence over all other considerations, including the rights of the parents. *Id.*

Furthermore, the agency is not required to offer services indefinitely, where a parent is unable to properly apply instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002).

Preserving reunification as a goal is not a viable option in this case. The record reveals [Mother] did very little to maintain continuous and meaningful contact with the [C]hildren after they were taken into care. [Mother] testified she understood substantial compliance with the treatment plan meant she had to put forth "as much effort as [she could at] every single visit, every, appointment, everything" and did not feel like the court order was overwhelming, yet continued to miss visits with her children without adequate explanation. Permanency Hearing Transcript, I, 3/15/17, p. 31-33.

During the first three months of the [C]hildren's placement, [Mother] refused visitation and did not see the children at all. From November, 2016 through the permanency review hearing in March, 2015, [Mother] saw her [the C]hildren a total of nine times. She was egregiously late to four of these visits, despite knowing 100% attendance and participation was required of her. Moreover, the testimony revealed even when [Mother] appeared for visits, K.W. interacted with her in the same way she interacted with other caseworkers in the room, evidencing a lack of bond between K.W. and Appellant. Permanency Hearing Transcript, I, 3/15/17, p. 5, 10, 15, 18, 43. *See also* Permanency Hearing Transcript, [sic] II, 3/15/17, p. 4-5.

Concerns about [Mother's] housing and mental health remained, given the home's rapid deterioration shortly after the [C]hildren were detained, [Mother] eviction, and subsequent failure to obtain new housing until after she was locked out of the

apartment. Though [Mother] recently moved into a new residence, boxes and clutter prevented workers from assessing the safety of the home and its suitability for small children.

Appellant's choice to minimize her traumatic past and mental health history to providers also concerned the Juvenile Court. Dr. von Korff's evaluation was the first time [Mother's] full mental health history could be examined in relation to her ability to parent because [Mother's] prior evaluations, based on her own reports, resulted in a finding [Mother] did not need services.

In Dr. von Korff's opinion, given [Mother's] history of trauma, patently biased-self reporting, and little evidence of a meaningful bond between [Mother] and [the C]hildren, it was in the [C]hildren's best interests to consider adoptive options. Psychological Evaluation, Dr. Peter von Korff, p. 19-20.

[Mother's] statements she would "make more of an effort" if services were continued did not assure the Juvenile Court [Mother] would be able to adequately parent [the C]hildren in the future. [Mother] stated transportation issues prevented her from attending court, visits, and other appointments, yet the Agency and other aides provided [Mother] with bus passes and other transportation assistance. When [Mother] testified at the March, 2017 review hearing, she continued to cite a series of extraordinary excuses for her lack of communication with Project First Step and inability to comply with the treatment plan. At every turn[, Mother] refused to take ownership of the reasons the [C]hildren were detained. Permanency Review Hearing Transcript, II, 3/15/17, p.13, 33-36.

* * *

To subject the [C]hildren to continued placement and deny them the safety and stability they deserve is not in their best interests. [Mother's] testimony, and the evidence presented by the Agency, show [Mother] refused to parent [the C]hildren or remedy the conditions which led to their placement. A goal change to adoption is therefore appropriate. It is respectfully requested the Superior Court affirm the order changing the goal of the dependency proceedings to adoption.

Trial Court Opinion (Mother), 5/16/17, at 7-10 (emphasis in original) (some

brackets in original).

With regard to Father's contention that the trial court abused its

discretion in changing the Children's permanency goal to adoption, the trial

court stated as follows:

> [Father] alleges the Juvenile Court committed abuse of discretion and/or error of law when it changed the goal of the dependency proceedings to adoption.
>
> The Juvenile Act generally requires the child protective agency to request a goal change when the child has been in placement fifteen out of twenty-two months. 42 Pa.C.S.A. 6351(b)(9). The Superior Court has held the underlying policy of the Juvenile Act is to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to indefinite foster care or returning them to abuse homes. ***In Re: C.B.***, 861 A.2d. 287, 295 (Pa. Super. 2004). Moreover, safety, permanency, and the well-being of the child must take precedence over all other considerations, including the rights of the parents. ***Id.***
>
> Furthermore, the agency is not required to offer services indefinitely, where a parent is unable to properly apply instruction provided. ***In re A.L.D.***, 797 A.2d 326, 340 (Pa. Super. 2002).
>
> Preserving reunification as a goal is not a viable option in this case. It is clear from the record [Father] refused to maintain continuous and meaningful contact with the [C]hildren. Further, [Father's] statements to service providers suggest he did not take parenting [the C]hildren or participation in Agency services seriously.
>
> On several occasions, [Father] reported he would comply with Agency directives or attempt to be more involved with [the C]hildren "because people tell me I have to." Permanency Transcript, II, 3/15/17, p. 9. Despite these statements, [Father's] attendance at visitation and the effort put forth interacting with [the C]hildren was abysmal. From November, 2016 through the permanency review hearing in March, 2015, [Father] saw [the

C]hildren a total of nine times and was often late. Even when [Father] attended visitation, he "parented from the couch" and interacted with the [C]hildren minimally.

Dr. von Korff's evaluation of [Father] included statements from [Father that] he declined services, refused to speak with workers, and chose not to participate with visitation requirements because he was upset with the Agency. Further, observation of [Father's] interaction with K.W., led Dr. von Korff to conclude K.W. was not bonded to [Father] and did not look to him as a secure, primary attachment figure. Psychological Evaluation, Dr. Peter von Korff, p. 4, 20.

Workers[']️ description that [Father's] home severely deteriorated after the [C]hildren were detained also remained concerning to the Juvenile Court. [Father] allowed the home to become uninhabitable, had to be locked out of his residence before he moved, and only recently obtained new housing, which could not be easily assessed for safety and/or cleanliness. Permanency Transcript, II, 3/15/17, p. 15.

[Father's] completion of the Fatherhood Initiative Program and statements [indicating that] he wanted to parent [the C]hildren were contradicted by [Father's] actions. He did not deny attending only nine visits with the [C]hildren in the span of seven months, nor could he show any appreciation of, or responsibility for, the reasons the [C]hildren came into care. [Father] continued to place blame on others, stating the [C]hildren were "wrongfully taken away." [Father's] inability to appreciate the severity of the [C]hildren's condition upon detention shows he will be unable to safely parent the [C]hildren at any point in the foreseeable future. His statements [that] he would participate only because he had to further show [Father] will not be able to successfully or independently parent [the C]hildren. Permanency Transcript, [sic] II, 3/15/17, p. 25-27.

* * *

To subject the [C]hildren to continued placement and deny them the safety and stability they deserve is not in their best interests. [Father's] testimony, and the evidence presented by the Agency, show [Father] refused to parent [the C]hildren or remedy the conditions which led to their placement. A goal change to adoption is therefore appropriate. It is respectfully

requested the Superior Court affirm the order changing the goal of the dependency proceedings to adoption.

Trial Court Opinion (Father), 5/16/17, at 6-10 (emphasis in original).

After a careful review of the record in this matter, we find no abuse of discretion on the part of the trial court in changing the permanency goal for the Children to adoption. Accordingly, we affirm the goal change orders on the basis of the discussion in the trial court opinions.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/13/2018